UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
In re VEECO INSTRUMENTS, INC.           :    MDL No.: 7:05-md-01695-CM
       SECURITIES LITIGATION            :
------------------------------------------------------- x
------------------------------------------------------- x
THIS DOCUMENT RELATES TO:               :
 ALL ACTIONS                            :
-------------------------------------------------------x

**MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTION
IN LIMINE TO PRECLUDE LEAD PLAINTIFFS' DAMAGES EXPERT
FROM OFFERING CERTAIN CALCULATIONS AS TO POTENTIAL DAMAGES**

Defendants' Motion should not properly have been brought as a Motion in Limine. Defendants first seek to preclude Plaintiffs' expert from testifying on issues he had no intention of testifying to. In fact, Defendants' motion is nothing more than a request for an advisory opinion from the Court dressed in the costume of a purported evidentiary motion. Then they seek to limit the definition of the Class in this case in a manner that should have been, but was not, raised at an earlier stage of this certified Class Action. Finally, Defendants' general argument that Class Members' investment decisions years after the Class Period have any bearing on their damages is contrary to law and must be rejected.

### I.   The 90 Day Look Back Period

There is nothing "erroneous" in Professor Feinstein's characterization of the cap on damages required by 15 U.S.C. §78u.4(e), nor is there anything erroneous about Professor Feinstein's calculations. Dr. Feinstein first calculated economic damages for stock purchasers, and then calculated "rule 10b-5 damages" using the statutory cap based on the 90 day look back period, and stated that legal damages are the lower of the two figures. See Feinstein Report, Ex. 1, at 27.

Because Dr. Feinstein calculates economic damages to be $3.22/share, and most Class Period purchasers lost much more than that on their Veeco investments by the end of the statutory look back period, very few investors are affected by the statutory cap. See Ex. 2 (price chart); Ex. 1 at 27-28. For example, Lead Plaintiff Steelworkers Pension Trust purchased 40,000 shares at $23.84 and $23.47/share on May 19 and 20, 2004, and held through the end of the "look back" period. Its statutory damages cap is greater than $9/share, well above the maximum economic damages of $3.22/share. It sold its shares in May 2005 at $14.76/share, so its investment loss was also greater than $9/share. If it held those shares today with the stock trading at $18.29/share, it would still have a loss greater than $3.22/share.

Nonetheless, Plaintiffs agree that Professor Feinstein should not testify about the law, and indeed there need not be any testimony before the jury concerning the PSLRA damage cap. Rather, the jury should determine only the economic damages, the amount of artificial inflation caused by Defendants' fraud. The PSLRA damage cap requires an undisputed mathematical calculation that will result in small reductions in payments to a very few Class Members. Although the arithmetic is simple with the use of a spreadsheet, asking a jury to average 65 numbers would be potentially disastrous. This issue can most efficiently be dealt with in a claims process that will follow judgment in this Class Action.

Defendants' suggestion that the 90 day "look back" limitation on damages measures economic (or "pecuniary") damages is mistaken. The PSLRA requires that plaintiffs prove actual economic damages, and then reduces the recovery of some plaintiffs to an amount decreed by Congress, which is lower than economic damages. The Congressional intent was plainly to reduce the cost of fraud to perpetrators and reduce recoveries to victims, not to approximate actual damages.

The Court, not the jury, is in the best position to apply this law to the factual finding of the jury.

### II. Dr. Feinstein's Testimony Properly Measures Damages For All Class Members, Regardless of Whether They Sold Their Shares

Dr. Feinstein's method for calculation of damages based solely on the purchase price has been accepted by numerous Courts, and by Defendants' Expert. The formula permits calculation of damages whether or not a particular Class Member has sold shares. Veeco first disclosed the critical facts concerning the alleged fraud on February 11, 2005. In the two trading days following that announcement, the price of Veeco common stock fell $3.22/share after adjusting for factors affecting both the market as a whole and companies in the same industry as Veeco. The price drop was statistically significant, so it was extremely unlikely that it could have been caused by random fluctuations. Based on this analysis, Dr. Feinstein concluded that had the truth been disclosed at an earlier time, the stock would have traded at a price $3.22/share lower than its actual, inflated price. In other words, the value of the stock received was $3.22/share less than the price paid. The Second Circuit endorsed this calculation method in the portion of Commercial Union Assurance Co. v. Milken, 17 F.3d 608, 614 (2d Cir. 1994) quoted by Defendants in their brief: "a defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got." Each Class Member who purchased after the fraudulent third quarter press release overpaid for the stock by $3.22/share, which loss was recognized on February 14, 2007. Defendants' expert, Dr. Vinita Juneja, used the same method and reached almost the same result. Ex. 3 at 30 (finding damages of $3.09/share using different indices to adjust for market conditions, with no distinction between holding and selling Class Members).

Whenever an investor sold shares after February 14, 2005, the proceeds of the sale would be

or will be $3.22/share less than they would have been absent fraud. An investor who holds shares today received owns proportionally fewer shares for dollars invested than it would have absent fraud.[1] Therefore, all Class Members have incurred a loss due to fraud, whether or not they have sold, or will sell some day at a higher price than they paid. This is commonly referred to as "out of pocket" damages, because $3.22/share is the actual loss from the pocket of the plaintiff. E.g., In re: Royal Dutch Shell Transport Secur. Litig., 904 F.Supp. 2d 605, 610 (D.N.J. 2005) ("The out-of-pocket rule permitted a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud as measured by the correction in the market price following curative disclosure."); In re: Crazy Eddie Secur. Litig., 948 F.Supp. 1154, 1165 (E.D.N.Y. 1996) ("Although damages in securities fraud actions may be calculated in several different ways, they ordinarily are based on out-of-pocket losses – that is, the difference between the purchase price and true value of the stock …"); See also Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 344 (2005) ("the Restatement of Torts, in setting forth the judicial consensus, says that a person who misrepresents the financial condition of a corporation in order to sell its stock becomes liable to a relying purchaser for the <u>loss the purchaser sustains when the facts become generally known</u> and as a result share value depreciates") (internal quotation marks omitted; emphasis added).

Subsequent prices of the stock are completely irrelevant to the calculation. Many things affect stock prices over time, and it is not unusual that the price could eventually recover from the post-disclosure level. But the fraud occurred at the time of purchase, and the damage became measurable when the fraud was disclosed.

---

[1] For example, an investor who purchased 1000 shares for $20/share spent $20,000. Absent fraud, according to Dr. Feinstein's calculation, those shares would have cost $16.78, and the investor would have acquired 1,192 shares for the same investment.

The out-of-pocket method means that where a stock trades freely on an efficient market and a complete disclosure reached the market, the price of the stock after a few days following disclosure is economically irrelevant (the price over 90 days remains relevant by statute). Royal Dutch Shell, 404 F. Supp. 2d at 609 ("Section (1) [of 15 U.S.C. §78u-4(e)] renders irrelevant to the calculation of damages any movement in the price of the security after the end of the 90-day look back period.").

Moreover, the structure of 15 U.S.C. §78u-4(e) makes clear that individuals who retain shares may bring suit. The statute explicitly permits individuals who retain shares for more than 90 days to bring suit, and it contains a specific method for limiting those individuals' damages. If Congress had intended an additional limitation, one would have been included. Royal Dutch Shell, 404 F. Supp.2d at 610 ("Since both the traditional out-of-pocket loss rule and Section 21D(e) of the PSLRA provide that a purchaser's loss may be calculated by reference to the amount that the purchaser overpaid and the true value of the securities, a purchaser has not needed to sell the securities to have suffered or to recover 'actual damages'"); citing In re: Cendant Corp. Secur. Litig., 264 F.3d 201, 219, 244 (3d Cir. 2001). See also Ong v. Sears Roebuck & Co., 459 F.Supp. 2d 729, 744 (N.D. Ill. 2006). The Royal Dutch Shell Court also discusses at length policy concerns that support permitting defrauded investors to collect damages for their injuries whether or not they have sold their shares. In sum, there is no basis for excluding current holders from the Class.

None of the cases Defendants cite are applicable to this case. The Second Circuit cases each address a different circumstance: where the Plaintiff could not, or did not, calculate what the shares would have been worth if the company had not committed fraud. The Second Circuit has limited Barrows v. Forest Labs, Inc., 742 F.2d 54 (2d Cir. 1984), and Commercial Union, 17 F.3d 608 to their peculiar facts. McMahon v. Wherehouse, Entertainment, Inc., 65 F.3d 1044, 1049-50 (2d Cir.

1995) (rejecting both precedents: "In [Commercial Union] 17 F.3d [at] 614-15 ... we acknowledged the possibility of benefit-of-the-bargain damages [i.e. out of pocket damages] in a Rule 10b-5 case, but declined to do so because the plaintiff's claims were speculative."). In Commercial Union, the securities were not liquid or publicly traded, so there was no price drop upon disclosure. In Barrows, the shares had been acquired in exchange for shares in another Company, and the Plaintiff offered a range of "true values" from $1.50 to $11/share, which the trial Court found to be too speculative. 742 F.2d at 59. In this case, Dr. Feinstein provides a non-speculative calculation of damages, based on the price decline at the end of the Class Period.[2]

The District Court cases are also far afield. In In re: Salomon Smith Barney Funds Fees Litig., 441 F.Supp. 2d 579, 591 (S.D.N.Y. 2006), and Merrill Lynch & Co. v. Allegheny Energy Inc., 2005 WL 1663265 (S.D.N.Y. 2005) (contract case involving sale on an ongoing business), there was never any securities price drop, so loss causation could not be established. Malin v. XL Capital Ltd., 2005 WL 2146089 (D. Conn. 2005), and In re: Estee Lauder Cos. Secur. Litig., 2007 WL 1522620 (S.D.N.Y. 2007) both concern deficient pleading of damages and loss causation, where the Court was unable to determine from the record if damages existed, and Plaintiffs were granted leave in both cases to perfect their allegations. As discussed above, all Class Members in this case suffered an economic loss because they paid more for their shares than their actual value for their shares, and suffered a diminution of value when the Company's true financial condition was revealed.

---

[2] Defendants also cite Carlisle Ventures, Inc. v. Banco Espanol de Credito, 176 F.3d 601, 606 (2d Cir. 1999), a contract case decided under Spanish law. The Court limited the plaintiff to rescissory damages because its representative testified that had he known of the fraud, he would not have entered into the contract.

## Conclusion

Defendants have provided no basis for limiting Dr. Feinstein's testimony. Their Motion to preclude testimony respecting shares not yet sold should be denied.

Dated: June 13, 2007

Respectfully submitted,

**BERGER & MONTAGUE, P.C.**

_____
Sherrie R. Savett
Carole A. Broderick
Arthur Stock
Phyllis M. Parker
Jeffrey L. Osterwise
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4674

*Lead Counsel for Lead Plaintiff*
*Steelworkers Pension Trust and the Class*